Good morning. May it please the court. Eric Levin for Christopher Blauvelt. I'd like to try and reserve two minutes for rebuttal. OK. What I'm going to do is just Dusty started on 10. What I'm going to do is I'm going to just have him set 10 minutes for each of the appellants. So you're not eating up the other two lawyers time. OK. OK. In summation, the government expanded the fraudulent scheme alleged in the indictment from specific misrepresentations made by fundraisers soliciting investments to include that Gigapix was a scam from the start because you cannot make money from independent media production. The government argues that this in summation was simply an illustration of a misrepresentation made by fundraisers. But that's simply not what it argued instead. And it cannot identify. I would point out a single quote from its summation to support that. What it argued over and over again was that Gigapix was a fraudulent scheme because it's almost impossible to make money from independent film. It even suggested it was beating a dead horse in rebuttal because it had repeated this theme so often. And it explicitly offered this as an alternative theory, telling the jury that it could convict on one or the other, either fraudulent scheme or misrepresentations. This amounted to a constructive amendment of the allegations in the indictment because it changed the charging terms of the indictment, in particular the fraudulent scheme allegations in the indictment. Go ahead. Didn't the court also instruct the jury to convict only if it found Blaveld committed the crime charged in the indictment? Why wasn't this sufficient to prevent Blaveld? I think the instructions that I had identified were that the particular scheme to defraud was not defined in the jury instructions. There was no instruction that I saw, and maybe the court found something different, that limited them to the allegations in the indictment. And instead, except the record 526, 527, the judge instructed you're going to have the indictment with you so you can refer to it as only a reference document, it's not evidence. So I don't believe that they were limited to that particular, as you're articulating. I guess one of the problems I'm having with the argument is the alleged false misrepresentations and the alleged omissions are expressly set forth in the indictment. So I'm trying to understand your variance argument, because it seemed to me that the proof at trial focused heavily on what the sales, the telemarketer said, and your defendant said to the potential investors, and what they failed to tell them that might have caused the investor not to invest. Well, I would point the court to cases like United States v. Ward and United States v. Dipentino, which are Ninth Circuit cases, where in Ward, for example, there was evidence of identity fraud as to certain individuals, but there was also evidence as to other individuals who were not named in the indictment. That was a constructive amendment, even though there was a sufficient evidence, nothing suggested there wasn't sufficient evidence. Maybe I'm misunderstanding your variance argument. I thought your argument was premised on this was a fraudulent scheme from the beginning, as opposed to these were legitimately incorporated companies, but then they raised capital through misrepresentations and securities fraud. Those are the two themes. The first one was not announced. But the basis for the misrepresentation and the omissions are set forth in the indictment. I'm trying to understand how your client would be prejudiced from the variance, where the proof of the fraudulent scheme, the heart of it, were the misrepresentations and the omissions. The fact that counsel for the government in their zeal characterized this whole thing as a scam or a fraud from the beginning doesn't really make much difference if the jury was asked to focus on what were the investors told or what was not told to the investors that should have been disclosed. Well, I think that the first of all, I've argued it's a constructive amendment as well as a material variance. But yeah, but setting that aside, the court has never suggested that this court has never found that simply because there was evidence of both the non amended and the amended theories that that answers the question. But the theory is that the defendants combined to structure a scheme and artifice to defraud. That's the heart of both mail fraud and securities fraud, is it not? That or well, of course, the instruction is a scheme to defraud or to obtain money through misrepresentations. Through false pretenses. And I'm still struggling to understand how your client was farmed by what you allege to be a variance in the indictment. I'm just not seeing the variance, I guess, is what I'm trying to tell you. Well, the variance is that nothing in the indictment announced that this was a fraudulent enterprise. It announced that it claimed that Gigapix was a company designed to produce media and that the fraudulent scheme begins when you read the indictment from misrepresentations by fundraisers about potential for future success and ways in which the money would be, the funds raised would be allocated. But I'm looking specifically at page two of the indictment where it's the introduction to the scheme to defraud. And it simply tracks the mail and wire fraud indictment almost word for word. Take a look at the indictment. E.R. 713. It's page two of the indictment, line six through 25. Excuse me, 15 through 25, paragraph six. Right. Under scheme to defraud. Right. Section B6. Yeah, it identifies a scheme to defraud as Gigapix, but it identifies it as a scheme to defraud because of the misrepresentations made by investors during the fundraising process. The harm is this. It's in the opening. We understand the harm. We're just trying to get you to focus on that the government's theory and proof was included within the allegations of the indictment, whereas in other cases they were not. I mean, right here in the indictment, that's what it says. I mean, I appreciated my colleague's questions because I was going to ask you the same thing. How do you get away from it when it's right there? Well, but nothing in the indictment says you can't make money off of these things, that no one can. These things are inherently unprofitable. This was a false concept to begin with. It actually recognizes that a company that's there to design, to produce various types of media, and that's in the indictment. But what you just said falls within the allegations at lines 22 through 24. To obtain money and property from such victims by means of material false and fraudulent pretenses, representations, and promises and the concealment of material facts. And then as I read later in the indictment, those misrepresentations and concealment facts are laid out in great detail in the indictment. And as I looked at the transcript of the trial, that's what the district judge was telling everybody to focus on. What were the investors told or what were they not told? Well, I believe what the government was doing was expanding on that, that they were saying this thing, even if you didn't tell any misrepresentations, it would be a fraud because you can't make money off of these things, period. Well, that goes to the risk of the investment, does it not? That basically, as I understood the government's argument, the investors were not told, look, if you're going to invest in this thing, this is a highly risky investment, because independent film companies don't do very well across the board. And as I pointed out, the harm here was that the government was having difficulty connecting Mr. Blauvelt to representations made by fundraisers. Well, but that's a sufficiency of the evidence problem. That's not a variant. No, it relates to variants, because the question is, did it affect a substantial right? And it does where it could have affected it. Do you want to reserve a minute for remarks? I was going to say, I want to understand your answer to Judge Nelson's question, because even if, and I truly appreciate my good colleague, Judge Tallman, talking to you about what he did, but even if you were right, the district court gave a jury instruction. And that jury instruction warned the jury that with respect to any of the defendant's acts not charged in the indictment, the jury could only consider those acts only as to the defendant's knowledge, which would protect the defendants from the juries convicting them for participation in a scheme not alleged. That was the instruction. Why doesn't that just end your argument? Because that was Judge Nelson's question, and I don't know whether you didn't seize it or whether you could answer it, because I couldn't understand your answer. What I had identified is a number of jury instructions that would have authorized the jury to convict simply on the government's argument that this enterprise, this company, was a fake company, was a fraudulent company, an inherently unprofitable company. They were allowed to find that the loss of money is evidence of a fraudulent scheme. They were told that even good faith— Now you're just making your argument again. The jury instruction said they could consider acts only as to the defendant's knowledge, which, in my view, protects defendants from them being convicted for participation in a scheme that was not alleged. Why is that not true? I respectfully disagree. Why isn't it true? I mean, give me a why. I'm giving you the chance to talk to me. I'm not leading you. I'm giving you a chance to talk to me. I think that the why is that they were told this is just a reference document, and they were—the government argued it in summation quite repeatedly, that this was a fraudulent scheme because you can't make money off of it, and that wasn't something that they were given notice of and opportunity to defend against. All right. I understand your answer. Thank you, counsel. Ms. James? Good morning. This is the court. Becky James for the appellant, David Pritchard. Mr. Pritchard is a serious and highly acclaimed producer who was making legitimate efforts to make GigaPix a successful studio. He was wrongfully convicted at trial based on cumulative errors, and I'd like to start with the continuance issue. The government and the— If I go to the sufficient evidence issue. I'm sorry? If I go to the sufficient evidence issue, ma'am. Okay. Let's go there, because it seems to me that's a big issue. If you haven't got sufficient—if they don't have sufficient evidence, I'd start there. Continuance is a matter of discretion. Sure. Sufficient evidence. I mean, I'm on plain error review here, am I not? Yes. Because nobody made the motion for an acquittal. Right. So at that point, what I've got to say, is there any plain error in the evidence that there was sufficient evidence to convict your client? Yes. Why was there not sufficient evidence? I'm going to give you a why. I could give you a lot of leading questions, because I have a lot here. I don't understand why you can say that. Your Honor, first of all, I guess to address the plain error issue, as this Court has observed, it's kind of difficult to see how, if a conviction were not supported by sufficient evidence, how that would not be a plain error. And I would certainly say that is the case here. As to why the evidence was insufficient— First of all, he testifies, right? Yes. Works with Sean Walker on prior projects before going to GigaPICS. He recruits Walker. He tells the FBI. He told the telemarkers what to say. And he spoke with 12 to 15 potential investors. Then he met with two to three investors. He admits telling Anderson that GigaPICS was doing well, that OZ3D was soon to be released. Then Walker testifies that he told PE. He heard the telemarkers making misrepresentations. There was never a time when the misrepresentations stopped and instead the truth was being told. That PE did nothing about it. I'm talking about your client when I say PE. That Walker saw your client frequently speaking with the investors, had meetings with them in his office. He interacted with your client every day. Then Anderson comes up and he tells the same kind of stuff. Then Goodman comes up and he says the same kind of stuff. Now tell me that's not enough to convict. I think the reason that we take a position that it's insufficient is that if you look at the nature of the alleged misrepresentations here by Mr. Pritchard, there are very few for starters. He was really uninvolved in the telemarketing side. Didn't he sign the letters? He signed a few letters. Right. But there were misrepresentations in those letters, Carol. Well, Your Honor, I don't believe there were because the letters, the primary- But at this point, wouldn't we have to find that there was clear error in the jury's determination based on its verdicts of guilty that those were in fact false representations? Well, right. And again, I don't know how that exactly varies from the typical Jackson standard, which it's just very differential to the jury's verdict. But in this case- But I guess what Judge Smith was, and I know you're well aware of this, was trying to remind you at the start, on plain error review, you've got a pretty tough uphill battle to convince us that there's been a substantial miscarriage of justice here. And that's hard to say in the face of the evidence that Judge Smith just recited. If the jury credited that evidence and discredited your client's testimony that he was truly innocent and didn't intend to defraud, pretty hard to say there was plain error here. Well, Your Honor, I don't dispute that it's a high standard. And just to address the specifics of the points that the government was trying to make- And I appreciate my colleague again asking you the straight question. All I did was try to put together all the evidence the government would say. And I'm trying to say to myself, I know that good counsel. She's going to come in here. I know her. Why is that not enough? Well, let me take through the government's contentions. And it came out through Walker and their other witnesses. So the misrepresentations that they put on Mr. Pritchard from the letters and from his conversations had to do with the plan to go public. But there was no evidence that that was not, in fact, true. In fact, we know, had he been able to present the evidence, that there were, in fact, plans to take the company public through a reverse merger. So there was no falsehood there, much less evidence that Mr. Pritchard was aware of it. Well, the so-called exculpatory evidence that was introduced later doesn't quite go that far. It looks to me to be very, very preliminary discussions about a potential- Well, that was a signed letter of intent, actually, or a letter of intent. And the representation was not that, you know, it's going to happen tomorrow. In fact, the timing, the time frame was accurate, second half of 2011. And, in fact, the letter of intent did indicate that time frame. But, Counselor, you complained that you couldn't introduce allegedly exculpatory exhibits. But didn't your client have those documents in possession prior to the trial? It appears that he did, Your Honor, but as his counsel represented and explained in his motion for a new trial, his counsel did not have adequate time in preparing for the trial to review those exhibits or to present them. Well, the problem I have with that argument is it looked like a lot of the documents were duplicative and essentially irrelevant, even though they were included in the document dump. So it sort of comes down to maybe a couple of thousand documents, and there was, what, more than three, almost four months between the indictment or the arraignment and the actual trial here? Which is, yes, which is really not a large amount of time in a case of this magnitude. And it's not just a matter of the discovery, but a matter of doing the investigation and finding those documents. Well, what I'm suggesting by my question is it wouldn't have taken that much time to go through that volume of documents. I mean, that's four banker's boxes full of documents. I go through that, double that, in preparation for this calendar, and I have usually about a month or two to do it. So how did the district court err in concluding that there was adequate time here, but defense counsel was simply not diligent in producing it sooner so it could be used at trial? Well, Your Honor, I think it is a little bit of a double-edged sword. I mean, if counsel was not diligent, we have, you know, asserted ineffective assistance. And to the extent he was not diligent, it appears on this record it may have been due to some health problems that he was having. That, though, is not Mr. Pritchard's fault. You can always do something after we get through with that. You don't have to do it in this case. Wouldn't it be better for you to take some more time and do some more discovery into that so you can make a better case? Because all you've got here are the bald allegations, and we generally don't hear those cases in this kind of proceeding anyway. Right, Your Honor. And certainly we could better develop the record as to the illness issue, for example, on a 2255, but I do raise the issue in the direct appeal because I think it is important for the court to understand in evaluating the prejudice from the denial of the continuance that, you know, even if it might appear that the counsel was being, you know, not sufficiently diligent, there was an explanation for that that did not fall on Mr. Pritchard's shoulders. And I think ultimately the question has to be, did Mr. Pritchard receive a fair trial? I also think on the ineffective assistance, the court doesn't necessarily need to reach, you know, go beyond the record in this case because Mr. Emick, in fact, said to the court himself that he could not adequately represent Mr. Pritchard at trial because of the lack of sufficient time in his motion for new trial. If I get to the fair trial issue, how do I differentiate this case from U.S. v. Scott? Your Honor, I think you might have to remind me of United States v. Scott. United States v. Scott is our case that we had. It's a 2011 case with the same judge. And they looked at a lot of the things this same judge did, and after they got through dealing with all of that, then they said, no, it was got it nonetheless a fair trial. Well, without taking the- And I'm not trying, I mean, he, in there the court was really big on, there were corrective instructions given as, which should have been given by the judge. The plaintiffs were not convicted of every count, and there was sufficient evidence. Well, if I look at this case, the judge did give corrective instructions. The plaintiffs were not convicted of every count. If I don't agree with you on the sufficiency of evidence, it seems to me like U.S. v. Scott is dead on, and I'm not going to be with you on a fair trial. Well, Your Honor, I can, you know, there are a number of cases with similar issues that have- I mean, this judge, we know this judge. We're not, we don't sit here not aware of what this judge is like and who he is. Frankly, you got a lot more out of him than I ever thought you would. You got a, it was continued until October. I was surprised about that. I mean, to be fair, and so what I'm trying to do is I'm just trying to say, given my standard of review on continuance, given my standard of review on, there's not enough evidence here to convict. Now I get to fair trial, you got a better standard maybe, but I'm having a tough time with U.S. v. Scott, which is dead on. Well, Your Honor, I think there are a few facts here that are really significant, and they do dovetail with the other issues. There was just a complete shutting down of the defense here, and it was really critical that Mr. Pritchard be able to testify, given the government's theory that this was a sham operation, that he be able to testify to his legitimate efforts. But those were shut down repeatedly. The efforts to take the company public, which would have directly refuted one of the government's alleged misrepresentations, but that was, you know, the judge would repeatedly say that's not relevant, let's get to this lawsuit. The efforts that Mr. Pritchard made to deal with the Iowa disaster, as it became known, were also shut down as cases in and about Iowa. But the jury heard that Iowa had reneged on its tax credit promises, and that was the coup de grace, if you will, for these companies, didn't it? But what they didn't hear was Mr. Pritchard's significant effort to get Iowa to respect them. What he did to try to correct that issue. You mean the lawsuit against Iowa in the hope that he was going to get $14 million out of the state? There were many efforts. He was making repeated efforts to negotiate with the state. So all of that went to his honest belief that he was going to turn that situation around. What do you do with the admission that he made to the FBI agent at the very end of the interview that basically he had totally screwed up? Well, totally screwing up is not fraud. Well, it came at the conclusion of a series of incriminating questions that the agent asked him that were designed to elicit admissions, that he'd engaged in fraudulent behavior. And then at the very end, he basically, I mean, it's up for the jury to determine, but one way you could interpret that answer is that he finally broke down at the end and said, I did it. Well, but he didn't say he did it. He screwed up. Well, I mean, the jury's going to have to decide what he meant by that, but that is one plausible interpretation of the statement. Well, what he actually said he meant by that was that he did not get out of the situation earlier and he shouldn't have done that. Well, that's the defense, okay? True. But the government's take on that was that he essentially admitted, I did it. Well, and I just don't think that saying, you know, after, I mean, as Your Honor notes, I mean, the agent is, you know, pushing him, pushing him, pushing him, and he says, well, okay, I get it. You know, I understand what you're saying. No, that's not what he said. Okay. You and I can go round and round on that, but on plain error review, that's a tough argument to make. I think my time is up. Your time is up. So let's hear from Mr. Zugman. Good morning, Your Honors. My name is David Zugman. I represent Sherry Brown. I hope this pleases the Court. I wanted to pick up on something Your Honor said. We're always happy to see you, Mr. Zugman. Great to be here, Your Honor. All right. In the last case, Your Honor said that we are here to do justice, and Your Honor said that we make a call based on this particular case. I want to make it clear that Ms. Brown is not in the same situation as Mr. Pritchard or Mr. Blauvelt. She was tried in a separate proceeding. She's accused of different conduct. I want to go right into Judge Smith's question about United States v. Scott. United States v. Scott was a prison murder case involving the Aryan Brotherhood, where this Court found there was overwhelming evidence. And for people who have done prison murder cases, there's always cameras, stabbings, et cetera. So this is not like United States v. Scott. In the 19 years I've been practicing before this Court, I have raised judicial bias in only one other case, United States v. Pritchard. That was an armed bank robbery with DNA evidence where my client was connected to the gun. And this Court reversed that conviction based upon the same sort of conduct that occurred in this case. I think that it's important that just last year, this Court in United States v. Lloyd found that there was harmful error based upon restrictions of a defendant's ability to present his defense and restrictions on cross-examination in a similar movie-based fraud prosecution. So I think the question is, can I establish that there was error? And I think that I can. And the reason I think I can is, Judge Smith, you're totally correct in saying that we give trial courts a lot of discretion in setting a trial. I don't think there's really any reversals out there for failures to grant continuances. But it does give the context for this kind of trial. Asking someone like Sherry Brown to go to trial in 140 days, no other court in this district or in my district, the Southern District, would require that. In Lloyd, it was 11 months. For the 10,000 pages, we usually give people time to prepare for their trial. But in your case, you did go to trial after those defendants, right? Yes. She got an extra month, basically. Yes. So, in effect, just, I mean, they moved to go to December. She got about December. She originally asked for April. I know what she originally asked, but then she came back and said December. And I would say that getting the severance granted on the morning of trial isn't quite as useful as knowing that you're going to be going to trial in November. Because you have to prepare for the trial. You don't get to write your opening statement in October. I'm not sure that argument, I think that argument actually cuts the other way. Because if you thought you were going to have to go to trial that morning, then presumably you were working really hard just before to prepare for it. And now you've got an extra 30 days that you didn't have before. So I'm not sure. Another 1,000 pages of transcripts. There you go. Yeah, exactly. It is. But I'm more concerned about the fact that if you look at what the judge did, consider that they asked for a ruling on 404B. No. They asked for the judge to clarify his rulings. No. They start to, whenever. I looked at the table that was prepared. We made this many objections. Yeah, exactly. But then I look at the transcript and I see that actually there were reasons for the court to sustain the objections that were made. And a lot of that testimony came in by counsel rephrasing the question or the testimony came in. The evidence came in through the testimony later on or from a different witness or from a different source. And so I was sort of left at the end wondering, okay, even if there were some improper sustaining of government objections, the defense basically got in a lot of what they wanted the jury to hear in considering their culpability. Well, I would remind that, again, we're here to do justice. And those items that got in got in with commentary from the district court. It comes in when we're trying to cross-examine Tiffany Ryan about her personal beef with Sherry Brown coming from AA. The judge says, no, that's irrelevant. But the jury heard that there was animosity between Ms. Brown and Ms. Ryan as a result of their relationship developed at AA. Through Ms. Brown, yes. But that's my point. I mean, this is not a Davis versus Alaska case where the trial judge shuts down the defense proffer of evidence and the jury never hears it. Here, the jury heard it eventually. The question is, should the district judge have allowed you to go even further than you were permitted to go? When Sherry Brown is on the stand and she's testifying, the jury is evaluating her credibility. When Tiffany Ryan is on the stand and you want to examine her about the personal beef, that's when the jury has a chance to evaluate how she reacted to those questions. But why can't the jury credit what Ms. Brown says about Ms. Ryan's bias and factor that into their evaluation of Ms. Ryan's testimony? But when is justice just close enough? The fact is that Sherry Brown had a right to examine that witness about that subject and the district court had no right, no reason, no logic to say, no, you just can't do that. And it gets worse with the Zucker lawsuit. I don't see how it's possible that Ms. Brown is disallowed from examining a witness about a lawsuit that regards the particular matter. No, you were not permitted to cross-examine based on an unverified civil complaint drafted by Zucker's lawyer. The judge didn't say that you couldn't use the document to form an impeaching question, but you just weren't allowed to introduce the actual civil complaint itself. And it looked to me like, under the rules of evidence, that's a proper sustaining of the objection. Am I misunderstanding the rule of evidence? Well, in United States v. Covey and Sandoval, Your Honor held that a statement of a lawyer was a statement of a client for purposes of federal sentencing. Here there's no question that Mr. Zucker agreed that this was his lawsuit, that this was filed in his name, and Ms. Brown wanted to ask him questions about that lawsuit. And when the district court denied the right to ask questions, the district court disparaged the lawsuit, said no. But you offered the civil complaint as an exhibit, did you not? We did. Government objected, court sustains that objection. So the document itself didn't come in. But weren't you permitted to elicit from Mr. Zucker that at some point on cross-examination that he thought that Ms. Brown genuinely believed in the truth of the representation she was making about the company and that the real bad actor here were the other folks? Well, and of course this gets to the question of- Did the jury hear that? In different contexts, yes. Yes, they did. Okay. So again, it goes back to my question, at what point do we say Ms. Brown didn't get a fair trial because the trial judge didn't let her introduce that evidence in the way that she wanted to introduce it, which was through an inadmissible civil complaint, which would then be used using the words of the civil complaint to impeach the witness when they're not his word? If this panel holds it's inadmissible, you'll be creating a split with the Tenth and the Gambler case that I cited to your honors, as well as the DMS helicopter case. I don't see how the rules of evidence say that this is inadmissible if it's found that this is a statement of Mr. Zucker. He hired a lawyer to write the complaint. I see my time's getting short. But you're trying to use the complaint to impeach him on the grounds of a prior inconsistent statement, and that is not a statement that the witness has made under oath, which is at least one of the bases that would have to be met here to lay a foundation for the admission of that document. Is it not? We attempted to give an offer of proof, and we were denied even that. Was that complaint verified? No. No. So it is the statement of the lawyer who drafted it, but not of the client. I believe under both California and federal law, it is his statement. All right. Well, you and I may disagree over what – Even though not verified. Even though not verified. All right. Quickly, I wanted to – And simply because we've allowed such a statement in a sentencing – That we hold clients to statements of their lawyers as agents. In a sentencing context. Yes. Which doesn't have anything to do – we don't have sentencing – or, I mean, evidentiary concepts in a sentencing context. We don't really keep them to any kind of an evidentiary standard in a sentencing context. That's the big part. I mean, I listen to his questions, and I'm right in to this. It doesn't seem to me that that case has any effect on what I'm going to do in this particular matter. Then may I move on to the – Okay. Do you agree with me? I don't agree with you. You don't agree. You think that just because you can use it in sentencing, it has something to do with whether you get it in a trial? I believe that because it's the statement of – Come on. You get a lot of stuff in a sentencing that you don't get in a trial. I think I possibly can get in a trial. All right. Your Honor, quickly, with respect to – there were several witnesses that Ms. Brown wanted to call and was disallowed. Specifically, a named victim in the indictment, Dr. Feldscher, who was going to come and say that Sherry Brown didn't make – she told him the investment was risky. This is really a case about what she said to the people who were investing. If she told them the truth, she committed no crime. These were investor witnesses, right? Correct. Named in the indictment. But where a declarant has sufficient time and motivation to abrogate the statements before making them, a district court does not abuse this discretion, it seems to me, under 8033 when he doesn't let it in. But he's – we're going to call Dr. Feldscher to go sit on the witness stand and say, this is what Sherry said to me, and the case is about, did she lie to him? So this is really like – this is the actus reus. Did I commit the crime? So, thank you. Okay. Thank you very much. Thank you. Appreciate your argument. Thank you. Good morning, Your Honors. May it please the Court, my name is Byron McLean, here on behalf of the United States of America. I was going to focus my comments on the three specific areas, but obviously I'll be guided by the questions that you all have. Well, can I interrupt you and say the thing that worries me most about this case is the restitution for Mr. Blovo. I don't know if I pronounced it correctly. Why shouldn't we remand this case for the district court to explain the $6 million disparity between his and Mr. Pritchard's restitution amount, particularly after the government recommended they both be charged with the $20 million plus? So when the court differentiated between the restitution amounts between Mr. Blovo and Mr. Pritchard, the government was taken off guard by that decision as well, because we thought they were both responsible for the full $20 million amount. But in researching the issue, it's my understanding that specifically based on the WAP 9 2008 case, that the court doesn't need to make explicit factual findings on the record to justify its restitution order. That gives some explanation. I mean, it's got to give some explanation. You've got the government arguing, as my good colleague has said, $20 million on everybody, and then all of a sudden they come up with $6 million more, and there's not even any basis. So the objection by Mr. Pritchard that he made was that this $6 million amount related to institutional investors, and he wasn't responsible for that particular amount of money, and the judge took it down. Well, that would have made it down to $14 million, wouldn't it? For Mr. Pritchard. Right, and then $20 million for him. And then $20 million for Mr. Blovo. My understanding is that based on 18 U.S.C.'s 3664H, the court may apportion liability to reflect the contribution, the relative culpability of the defendants, and clearly this court found that Mr. Pritchard was less culpable than Mr. Blovo. So just hypothesize $6 million extra? Again, the government felt as if there should have been $20 million for both. We considered appealing that particular issue and decided not to for various reasons. We do think that the court got the overall total amount correct, the $20 million amount. I don't think there's a – well, I guess there is an argument made by the defense as to that, but assuming that we find that $21 million is reasonably supported by the record, I guess that's $20.9 million. But I'm still trying to understand the justification for the $6 million credit for Pritchard. And I'll be honest, it's hard for me to justify the court's – I mean, the argument made as to Ms. Brown was she should only be ordered to make up for the investors that she had direct contact with, and that came out to $2 million and change. Right. But what's the justification for $14 million on Pritchard as opposed to $20.9 million? And quite honestly, I would be speculating as to what the district court was thinking. My belief is that he felt that Mr. Pritchard – He gave no reason. He did not explicitly explain why he gave the $6 million difference. And my understanding based on reading WAC 9 2008 was that the court was allowed to do that, but – Well, I don't think there's any question that the court has the authority to apportion as opposed to holding everybody jointly and severally liable. But I think our case law says that there has to be enough in the record so that on appellate review, we can at least understand what informed the trial judge's decision on restitution. And based on your answers, I'm having a hard time finding that that standard has been met on this record. And it's hard for me to defend the district court's determination that Mr. Pritchard was responsible for $6 billion less because, again, the government felt as if they were both responsible for the full amount of restitution. Okay. I did want to address briefly the argument that was made concerning a constructive amendment or material variance to the indictment. And one of the things that counsel for Mr. Blavat mentioned was that the government cannot identify a single quote in the closing showing that its theory was consistent. And I think that's incorrect. First of all, the government's consistent theory throughout the case was that Mr. Blavat and Mr. Pritchard in that first trial got investor money through material misstatements, material omissions, by deceit. And basically, when they got the money from the investors, they misused that money for their own personal benefit and didn't use it as they had described to the investors. And there are various quotes throughout, starting with the opening, which I did in this particular case. In that opening, I said, quote, this case is about theft of money through lies and deceit. That's at volume 2 of 6, GER 354. Then also was mentioned in that same opening, the investors relied on the representations and on the statements that were made to them by the salespeople, but even in particular by these two defendants, Mr. Chris Blavat and Mr. David Pritchard. That's at GER 358 to 359. And then in the closing, my colleague mentioned in the closing that, quote, almost no money at all was used to make movies. You'll remember, 40% administration, over 25% for the salesroom, and only if you are giving them the benefit of the doubt, 20% ever going to anything that could ever make an investor a dime. That's in volume 6 of 6 at GER 1224 in her closing arguments and was repeated at GER 1283 in rebuttal argument. The one quote that the counselor mentions about my colleague saying beating a dead horse, he actually doesn't finish off the rest of the sentence. She said, and I quote, beaten enough of a dead horse that you cannot make money through independent movies. But then the rest of the quote is, when, as Defendant Blavat admitted to Special Agent Storer, all of the money was being eaten up by the overhead of the company. That's at ER 519, the appellate's brief, and also at GER 1289, volume 6 of 6. So again, the government's theory throughout was that, look, when you don't tell the truth to investors and when you misuse their money, you're not going to be able to have a successful business. Specifically, when you focus on companies like these, that it's already tough for them to make money. And Mr. Pritchard admitted in his testimony that this was, quote, an 8% business, meaning only 8% of these type of ventures are successful. He mentioned that at GER 973. He said it was speculative, that it was risky. That's at GER 974 to 976. All of this consistent with what the government alleged in the indictment. The specific allegations being the investments in GigaPix and OsterD are risky, that GigaPix was struggling financially, and the specific misrepresentation that was mentioned in the indictment, that only 19.6% of the money in GigaPix and 5% of the money that was raised for OsterD was actually going toward anything relating to production and promotion. I'd also just note, for your honors, that the jury instructions that were filed in this case were filed a week before the trial was severed. The trial memo that the government filed was filed a week before. None of that changed after the district court severed the case on October 14, 2014. I'm going to interrupt you because I kind of understand the government's argument and where you're going. I'd like you to focus in on why the district court didn't abuse its discretion in limiting the scope of the cross-exam of Brown's former co-worker. And that would be Ms. Tiffany Ryan. Yes. I'd like you to focus on that because it seems to me that that is a big part of counsel's argument, and frankly, after I got through hearing his argument, I said, I'd like to hear what the government has to say about that. So for Tiffany Ryan, the government called her as its witness. She gave testimony. Then the defense counsel cross-examined her and cross-examined her concerning this bias that they're talking about, the hostility between Ms. Brown sponsoring Tiffany Ryan, and I think she even said that it came out that she stopped sponsoring Ms. Ryan because she felt that she had a poor work ethic. Well, it seemed to me that counsel tried to cross-examine her about her bias, but the court cut it off pretty quick. The court cut it off the second time around. That's what I was getting at. So there was a direct, there was a cross, there was a redirect, and then on recross, they tried to bring it up again. I believe that's at GR 541 of the transcripts. And at that point, the court was like, look, this isn't a case about alcohol phenomenon. It actually chastised both parties afterward, outside of the presence of the jury, to stick to the issues in this case, that this is not about alcohol phenomenon. Already during the first cross-examination of Ms. Tiffany Ryan, the alleged bias that she had with Ms. Brown was brought out, and it was just being regurgitated on the recross. And so the court at that point in time had a responsibility and also had the right to kind of control his courtroom and cut it off at that point. So you're saying that the cross in the first cross was sufficient? I am. And I'm also saying that the cross in the second cross actually really went beyond the scope of the second direct examination. Can you give me those two record sites again? I would like you to give me those again. I've got 541. What is the first cross record site? So it would be right before GR 541. And I believe it was around GR 523. Or GR 520, around that period. Okay. Thank you. Okay. Moving on to the topic of whether or not the defendants in this case received a fair trial, or there was any type of judicial misconduct in this courtroom. I'm the only person arguing before you today who, I would say, had the privilege of trying this case in front of the district court judge. And as I think Your Honor referenced, we're very familiar with this particular district court judge, and that it can be, I would say, a challenge if the district court judge does not, for whatever reasons, like your case, whether you're the government or the defense counsel. In addition to being before him and hearing stories of government cases that have been dismissed, I understand that. That is not this case. This was a case where this court was within the bounds of what was permissible, and he was trying to control his courtroom in order to make sure that both parties focused on the issues at hand. I'd like to actually focus on a few specific examples of that from both trials. First, on Ms. Sherry Brown's case. One of the ways in which we know that this district court did not have any type of appearance of advocacy or partiality or bias toward Ms. Brown is because at the end of the government's case in chief, it acquitted her on the securities counts, even though the government felt that if it had proved up that evidence against Ms. Brown, and you can look at GER 594-596, and we were trying to argue that in front of the district court, you set the government down. Then if you look at the fact that after Ms. Brown was convicted of the 22 counts in the indictment that she was, that were able to go to the jury, she was facing a guideline range of 14 years to 17.5 years, yet she was sentenced to probation. That doesn't seem to be an example of a judge that's showing any type of bias or is partial against the defendant. Then if you look at, I actually had the privilege of cross-examining Ms. Brown when she was on the stand, and it was a little contentious. Ms. Brown wasn't answering my questions directly or completely, and after outside of the presence of the jury, the judge actually advised Ms. Brown and said, quote, Ms. Brown, you're not helping yourself by not answering the question that's put to you. You're not helping yourself at all. Actually trying to help Ms. Brown, in my estimation, to get her to focus on answering the questions that were being asked. Her own defense counsel, in closing, actually said, you know what, my client was being evasive. She wasn't answering the questions that were being asked. As a lawyer, this is how I would have answered them. And the court obviously said, well, no, you can't do that. You can't say as a lawyer how you would have answered the question. But the point being is that Ms. Brown wasn't helping herself even as a witness, and the judge tried to intervene outside of the presence of the jury to help her. Again, not an example of this judge being biased toward her. As was alluded to, the judge gave curative instructions at both the beginning and end of the trial, mentioning to the jury that if for any reason I have to interrupt the attorneys because they're zeal for the cause, they're going outside of the bounds of the federal rules of evidence and procedure, don't take that as if I'm supporting one side or the other. He gave that curative instruction both at the beginning and the end, which I think is informative. And then finally, the problem for Ms. Brown was not that the judge was biased in any way or partial against her in any way. It's that the facts just did not support her. Facts can be stubborn things. And the government put on witnesses, former investors, that said that they spoke directly with Ms. Brown and that she made misrepresentations to them. We put on former employees at Gigafix that said that it was clear to everyone at the company that this company was failing as of September of 2009 and that Ms. Brown knew it. But yet she continued to solicit money from investors based on false representations. And then I think the kicker, specifically for the jury, was the fact that Ms. Brown herself made a $30,000 loan to this company, this company that she claims didn't know that was failing, and then solicited in additional between April 2011 to August 2011 an additional half a million dollars to a million dollars from investors and ended up paying herself back for the loan that she made to the company and didn't tell any of the investors any of this information. So I think that based on that information, it shows that this court was not biased against Ms. Brown in any way and that the facts against Ms. Brown just did not help her. In relation to Mr. Pritchett and Mr. Blauvelt, who did the trial first on October 14, 2014, the problem for them is that, again, facts can be stubborn things, and based on the multitude of statements that they gave to the FBI agents beforehand admitting their culpability, that did not help them. Their defense was not a legal defense. The defense that they were trying to make was that, sure, although this company was failing, we tried to make it right. We thought that we could still make this into a successful company. But the problem is, and it's based off of the Beecroft case from 1979 before the circuit and the Benny case in 1986, is that a good faith belief in the ultimate success of a venture is not a defense to lying to your investors. It's clear black-letter law from this court, and that's what these defendants were trying to do. That was what their defense was. And that's why the government actually gave them, and I actually disagree with what counsel mentioned, that the government didn't give them any leeway in presenting their defense. He actually gave them substantial leeway in talking about Iowa and talking about all the things that they did to try to help the company. You can look at, if you look at GER, and I'm saying GER, so this is the first set of GER sites from the first trial, GER 925 to 927 and GER 1027 to 1028, when Mr. Pritchett was on the stand, he talked extensively about the Iowa disaster and how that affected the company. His own witnesses, Mr. Kornweiser from GER 848 to 852, also talked about the Iowa disaster and how that affected the company. But that was clear. The government doesn't dispute that. The Iowa disaster hurt the company, but the question was, how did you respond to that disaster? And the court even said that, I believe, at GER 929, when he interrupted defense counsel and said, look, it's not about Iowa. It's about the fact that the money that Iowa was supposed to give didn't give, but it has nothing to do with the false statements that your clients were making. That's the issue in this case. And if you look at all of the testimony, again, from the investors that spoke, that said they spoke specifically to Mr. Blavat and Mr. Pritchett, to the employees that testified that said that clearly Mr. Pritchett and Mr. Blavat knew that this company was failing and that they were making misrepresentations to the investors. If you look at the defendant's own statements, Your Honors, I'd like you to focus on the testimony of FBI agent Adam Storer, which is volume four of six, GER 771 to 781, where he says that he interviewed Mr. Blavat. He interviewed him on multiple occasions, on three separate interviews. March of 2012, another time I believe it was April of 2013, August of 2013, and then March of 2014. There are multiple quotes, recorded conversations that were played in the courtroom where Mr. Blavat explicitly admitted the conduct that he engaged in. One quote that I just want to mention, if you look at GER 1198 to 1199, the question was, what did Mr. Blavat communicate to you in that interview on August 12, 2013, concerning unregistered securities? He, Mr. Blavat, made a comment to the effect of, selling unregistered securities was not the worst thing he had done in his life. Another relevant one, March 7, 2014, and that was recorded and that was played in the courtroom. Question, who does Mr. Blavat say was responsible for the mismanagement of the OZ3D funds? The agent store responded that he, meaning Mr. Blavat, himself was responsible. That's at GER 1202. And the same thing is in existence for Mr. Pritchard. He was interviewed by FBI Special Agent Eric Podachek. That's volume four of six of the GER, of the government's excerpts of records. Specifically, if you look at pages 771 to 781, I believe it's very informative. And it was a June 5, 2014 interview. It's volume four of six, and I think the entire direct examination of Mr. Podachek is 788 to 820. And the question, this is a very telling question and answer portion. Question, did you ask Mr. Pritchard whether the letters he wrote contained new misrepresentations or omissions? Agent Podachek responded, I did. Question, and what did he say? Agent Podachek's response, he told me that in 2010, 2011, he probably didn't include all of the bleak, blunt stuff that was occurring at the company. Question, and was that a quote? Quote was, quote, did not get all of the bleak, blunt stuff. Did he elaborate on this later in the interview? Yes, he did. What did he say? He was, you know, quote, was I parsing it thin? Probably. And is that a quote as well? That's a quote as well. Did Mr. Pritchard say how far along they got with Oz3D? He told me that Oz3D made it to the pre-production stage, but physical production had never actually started, meaning that when they said in those letters that Oz3D was in production, that was a lie. One other quote. Did you ask Mr. Pritchard if he should have told the investors that the majority of the first $8 million raised through the Oz3D offering was going to be used to pay gigapix expenses and things other than the production of Oz3D? Answered by Agent Potajek, I did. And what did he say? He told me that he should have told that information to the Oz3D shareholders, but he did not. That's at GER 815. If I could interject again, I understand what you're going to there and what issues. Do you want to focus on why it wasn't an abuse of discretion to allow more of a continuance to the first two dependents? I do, Your Honor. I mean, you stipulated to go to April, knowing what you'd put in the discovery, knowing how tough it would be to get through it. Then the judge said, and all he said was, not enough. Then you stipulate to go to December. He again says not enough. So he sets it in October. Yes, Your Honor. Why is that not an abuse of discretion? Because I think what the judge was weighing is the fact that you had Mr. Blava on the one hand, who wanted to go on July 22nd, 2014, was not willing to stipulate to any type of continuance whatsoever. And then you have Mr. Pritchard, Ms. Brown, and Mr. Pusateri, who was convicted but is not appealing his convictions, who wanted it to go initially to April of 2015. And the governor's position was that, look, this case is so complex in our mind that it cannot go on July 22nd, 2014. We acknowledge that. The defendants are saying they want it to go until April 2015. Honestly, oftentimes, in our view, we're not going to oppose that type of or go against that type of stipulation. So we were fine with that. The judge didn't feel as if enough information was given in that stipulation. So a second one was filed, which gave more detail from the defendant's point of view as to why they needed more time. Again, Mr. Blava did not stipulate to that continuance. So the judge has to weigh those two competing concerns. Your argument essentially is that the court was concerned that Mr. Blava was seeking a de facto severance by standing on his speedy trial rights and therefore not waiving excludable time when his co-defendants were seeking, were willing to waive, and were seeking a continuum. Is that your argument? Well, my argument is that I would assume and I hope quite rightly so that the judge read the stipulations and that in the stipulation, Mr. Blava, who was in custody at the time, wanted to go immediately. And he's not willing to waive speedy trial time. Right. He's saying, I want to stand on my speedy trial rights. I want to trial as soon as the law says I'm entitled to it, which is, isn't it 70 days from date of arraignment? Yes. Okay. And he's saying, I'm not waiving any more time. So now he's faced with a conflict between Blava refusing to waive and the co-defendants saying, we'll waive and we want a later date, and the court's got to balance them. He has to balance those concerns. The way in which the court ends up balancing those concerns is saying, we'll go on October 14, 2014. Which would have been within the speedy trial time for Blava, assuming that there were pretrial motions filed that would have stopped the clock. Well, at that point, I don't believe there were any motions that had been filed at that point in time. But Mr. Blava's speedy trial clock ended at the beginning of August, because it would have been two weeks after the first trial date. So the court, on its own volition, ended up saying, Mr. Blava, even though you want to go on July 22, you have to – Did the court enter a 3161H8 order? I don't believe so. 3161H? H8. I'd have to look at the record again, but I don't believe there was that. Isn't the court required to do that in order to avoid violating the Speedy Trial Act? I'm pretty sure that's what the law says. Okay, so if that's – Unless the law says – So if that's part of his order, where he can see the trial date, maybe that was a provision in that particular order that he filed. I don't know. Yeah, the court makes a finding that this is an unusually complex case, and therefore it's going to – Right, no, the court did file that. He did that. Yes. Okay. Yes. So that takes care of the speedy trial problem. And the court determined that, look, I have these two main concerns. You're going to go in October. By applying the factors that I have to apply to these particular situations, how do I come out that this isn't an abuse? Well, the most important factor is whether or not there was any prejudice to the parties. And I think based on the record you have before you that there was not. One is that – Well, if there's evidence that was in that 10,000 documents that nobody found because they didn't have enough time to find it, that's pretty much prejudice. Well, it needs to do with the government that – I mean, that evidence was given three to four months before trial even started. We gave them, you know, the documents, all the discovery at the very beginning, and then as we – obviously we have an ongoing responsibility as we get more information to continue to provide discovery. So anything we got ongoing, we provide it. Are you just saying they should have been able to get through? Absolutely. Why? Well, first of all, because half of the – Are you adopting the good argument of my colleague in his questions, that if you shut those papers down to what they really were, it's not really 10,000? In part, I am. And also half of those – You like that question. But also half of those documents were questionnaires that were sent out, 20-page questionnaires that were filled out by the investors, and they were providing the materials that these defendants gave them when they invested in the company. So a lot of these pages were duplicative. They were the PPMs that the investors were sending back, saying this is what was given to me. And each of those PPMs was 40 to 50 pages long. So although, you know, we can say it was 10,000 pages of discovery, I think when you look at it, it was not as extensive. As I understood it, there were 10,000 documents, plus there was a disk of bank account records from – was it 20 or 40 different bank accounts? It was 42 different bank accounts, and we used half of those for our financial – But that's financial stuff, right? If it's relevant at all, it's relevant to sentencing and restitution. Well, true. And also the only person who said that they were going to put a financial analyst on the stand was Mr. Blaubelt, who wanted to go July 22, 2014. And he got his weekend continuance but didn't call that witness. Exactly. Okay. Before you sit down, Mr. Zugman mentioned an investor witness by the name of Dr. Felcher. Dr. Felcher. What's the story with Dr. Felcher? So first of all, the defense did actually put on investors in their case in sheet. They put on a person by the name of Mr. – We're talking Brown. Mr. – I'm sorry? We're talking Brown. Oh, Brown, yes. The person by the name of Mr. Philip Ruel. No, no, we're talking – yeah, Brown's trial. Right, so they put on – We're talking the Brown's trial. Right, Brown's trial, the second trial. I'm just trying to make sure. Yes. I want to make sure my memory is the same as yours about Brown's trial. So they actually ended up putting on an investor witness by the name of Mr. Ruel, who they did a direct examination of and put on the stand. What the court – and they could have put on Mr. Felcher if they wanted to. What the court was saying, though, was that you can't put on a witness on the stand in order to simply have them regurgitate self-serving third-party statements that Ms. Brown – what Ms. Brown's honest belief was in the company. I mean, it's hearsay, is it not? That would be hearsay. And also, it's not within the state of mind exception under Rule 8033 because that specifically says you can't get into evidence someone's beliefs or memory or that sort of thing. So it would have been inadmissible. And I think that the court was correct in that. So that was the reason why Dr. Felcher's testimony was – Well, that's why – my understanding is that's the reason why they didn't put Mr. Felcher on the stand. They could have. Because the court sustained hearsay objections with regard to – I'm sorry, the witness. Mr. Ruel. R-U-Y-L-E. Right. R-U-Y-L-E. And then also, even before that, there were – and this was one of Mr. Poussé-Terry's – also put on an investor witness. And that's not in the record before this court because Mr. Poussé-Terry was not appealing. But he also put on an investor witness, and his testimony was limited based on these same rules of evidence. So based on that, my assumption is that's why they decided not to put Dr. Felcher on the stand. Thank you. Thank you, Your Honors. All right. I will give each of you two minutes in rebuttal. I did have an opportunity to look at the jury instructions. I believe that you were talking about Judge Smith. There is an instruction that refers to other acts not charged here. That's a 404B instruction, standard 404B language, that bad acts are to be used only for intent, knowledge, absence of mistake, absence of accident, no other purpose. It didn't limit the jury's consideration of this new theory that the government introduced in summation. It wasn't – the government's correct. They didn't introduce it in the opening statement. But the government also said during the opening statement that it was going to produce these scripts that allegedly Mr. Blauvelt had given to these telemarketers, and they were never able to do that. But so what? I mean, if the evidence came in as to what the representations were that were made and there was testimony from the telemarketers that they were using scripts at some point. There was no testimony from telemarketers that he gave them scripts that contained anything false. Okay, but the – but didn't – wasn't there testimony as to what the representations were that were made to the investors? Yes, there were. So I'm still trying to understand how were you prejudiced by the government's claim that we have scripts but no scripts came in? The question was how do you attribute telemarketers' misrepresentations to Mr. Blauvelt. He was not someone who made these calls. So was the representation made in opening that these were scripts that he had written and given to them? That was the implication. They weren't able to do it. Did you argue in closing where are the scripts? The government promised you they had this smoking gun here, but there's no gun. I wasn't trial counsel. Well, when I say you, I mean Mr. Blauvelt's defense guy. I'm not sure if that was ever mentioned in defense summation. I mean, it seems to me if it's that important that you would seize on it. What I'm doing is I'm giving context to the reason for the change. The reason for the change is that there were some issues with the case proving connecting Mr. Blauvelt to particular misrepresentations made to investors. We don't need to deal with that problem, I think the government realized. If we just say this entire thing was a scam from the start, the judge gave other instructions. Did Mr. Blauvelt actually meet with some of the investors or talk to them? There were testimony from two investors who testified that they spoke with Mr. Blauvelt and Mr. Pritchard. And then both he and Mr. Pritchard made incriminating admissions to FBI agents about those statements and their truth or falsity. I don't believe that's correct. I think what the government pointed to is he said something to the effect of this isn't the worst thing I've done, which is not a basis. Your time is up, Mr. Levin. Thank you. Ms. James? Thank you, Your Honor. You're welcome. I'm just going to hit a few points. So as far as, I just want to respond to one point that Ms. Brown's counsel made regarding not being reversal based on continuance. There are a number of cases where this Court has reversed on the denial of continuance. We've cited them. Flank, Mejia, Nguyen. So it's not, I just didn't want to leave that unanswered. Returning to Judge Smith's question about the Scott case, in that case, the only issue really that was raised that was similar to here is the appearance of partiality in the questioning. And if that were the only issue we had, we might be controlled by Scott. But we had numerous other issues in this case, including evidentiary issues as well as the continuance. So on cumulative error, this case is definitely different from Scott. More similar, I would say, to the Lloyd case, which we discussed in our brief in which there was a reversal on the lay opinion testimony, among other things, and cumulative error. And that case is instructive, particularly as to Sean Walker's testimony. And ironically, the Pritchard case, which has no relation to our case but happens to involve the same judge and the same last name, was also a reversal, and in a particularly similar issue where the judge made a comment, as he made here, that the government is not on trial in this case, shutting down the cross-examination of the federal agent. And that was exactly the comment that was made here, among many others. That was over the change in FBI policy about recording interviews? It was about the accuracy of the notes. Because the Bureau had stopped recording interviews. They did not record Mr. Pritchard's interview. The other interviews were recorded. So another agent had taken the notes. But because of the change in policy, right? That was the explanation for why they didn't. Why the agent did not. It was a change in the note-taking. Right. But the comment actually came up specifically as to the accuracy of the notes that were taken. Right, which would have been dispelled if we had a verbatim recording. Exactly. So then as to the government's point that it not being a legal defense that the ultimate success of the operation, it does, however, negate in this case the intent of the fraud. And that was to the extent Mr. Pritchard did have an honest belief in the viability of this company and the viability of the efforts, that did negate his intent to defraud when he did not disclose, say the company was in trouble or said it was going to be a winner. And just on the continuance issue, I would just point out, although Mr. Blauvelt did not stipulate to the continuance, there is no evidence that that was what persuaded the district judge not to grant the continuance. In fact, the judge set the trial date on a date that was inconvenient. I mean, this is the Central District of California, and we understand the docket of that court. And part of the problem, even when the parties come in to stipulate, is that the judge has a docket to manage. Now, we can quarrel with whether or not this judge appropriately manages his document, but that is certainly a factor that trial judges have to consider when continuances are requested. Well, courts, of course, have discretion to manage their calendar, but that can't override the defendant's rights to have a fair trial. And I think that was well articulated in this case. You're over time. Thank you very much. Thank you very much. Okay. Mr. Zugman, you get the last word. Thank you, Your Honor. Your Honor, I want to give my compliments to opposing counsel. That was a fine closing argument he gave to Your Honors, but it belonged to a jury. The whole point is we have this Lloyd case that says that if I can show that there's error, I should get a chance to try this case to a jury. I want to pick up on Judge Smith's question with respect to the Alcoholics Anonymous. It is correct to say that the question of hostility between Ms. Brown and Ms. Ryan did come out during the first cross, but the Alcoholics Anonymous, the source of the bias, that came out during the second cross, and that's what the judge immediately accepted. Well, let me ask you the question a different way. What additional testimony did you expect to elicit from Ms. Ryan with regard to AA that you were prevented from crossing on? I think that Alcoholics Anonymous is a very personal and important organization of people who participate in it, and I think that the fact that Ms. Brown and Ms. Ryan have this problem that originates in that intimate area is something the jury should use to evaluate Ms. Ryan's credibility. But the jury heard that the two women met at Alcoholics Anonymous, and wasn't Ms. Brown the sponsor of Ms. Ryan? Correct, for some time. And the jury heard that she later became very disenchanted with Ms. Ryan because, for whatever reason, at AA meetings, but also because of her work ethic in the job? Yes. So what additional evidence did you want to introduce on cross-examination regarding AA? I wanted the jurors to see Ms. Ryan's demeanor and how she reacted to the questions. I think that's how a jury evaluates someone's credibility. You're not answering my question. I want facts here. What were you going to cross-examine her on other than to talk to her about intimate and personal issues regarding AA? Well, we were going to ask Ms. Ryan about how her relationship with Ms. Brown affected her standing within AA, and I think that would have been important to Ms. Ryan because I do think it's, for some folks, it's more important to them than their church. So I wanted to quickly get to the point of the fact that Ms. Brown was sentenced to probation and was given the lower number of restitution. But she got a pretty good break, both on the sentence and on restitution. I was actually surprised. She's in her mid-60s. This is the first time she's ever been in trouble. What was her range? 168 to 210. And she got five years probation. And she is well aware that if she goes back to trial, she's risking that, and still she comes to this court because she wants her fair trial, and that's what she was entitled to. Thank you. Okay, thank you very much. The case just argued is submitted to counsel. Thank all of you for excellent arguments. We are adjourned for the day. All right. Thank you.
judges: D.W. Nelson, Tallman, N.R. Smith